# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THERESA FRANCES VEITE,           )
                                 )
      Plaintiff,              )    Civil Action No. 11-28 Erie
                                 )
  v.                             )
                                 )
MICHAEL J. ASTRUE,               )
Commissioner of Social Security, )
                                 )
      Defendant.              )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District Judge.

## I.    INTRODUCTION

Theresa Frances Veite ("Plaintiff"), commenced the instant action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying her claims for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq*. Plaintiff filed her application on May 27, 2009 alleging disability since May 3, 2009 due to lung cancer (AR 101-107; 132).[1] Her application was denied, and following a hearing before an administrative law judge ("ALJ") held on March 31, 2010 (AR 22-56), the ALJ found that Plaintiff was not entitled to a period of disability or DIB under the Act (AR 10-17). Plaintiff's request for review by the Appeals Council was denied (AR 1-3), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are the parties' cross-motions for summary judgment. For the reasons that follow, the Plaintiff's motion will be denied and the Commissioner's motion will be granted.

---

[1] References to the administrative record [ECF No. 5], will be designated by the citation "(AR ___)".

## II. BACKGROUND

Plaintiff was 53 years old on the date of the ALJ's decision and has an eighth grade education (AR 17; 101; 137). She has past relevant work experience as a housekeeper and machine operator (AR 133).

Prior to Plaintiff's alleged disability onset date of May 3, 2009, an MRI of the Plaintiff's lumbar spine dated April 12, 2005 revealed a small central disc herniation at the L5-S1 level causing very minimal impingement (AR 280). An x-ray of Plaintiff's cervical spine dated April 18, 2007 showed fusion of the C5 through C6 with excellent alignment and no evidence of fracture (AR 278). An x-ray of Plaintiff's shoulder dated April 18, 2007 was unremarkable (AR 279), and a left shoulder MRI dated May 31, 2007 revealed tendinopathy, but was otherwise unremarkable (AR 277).

The medical evidence following Plaintiff's alleged disability onset date reveals that on May 4, 2009, Plaintiff presented to the emergency room at the Bradford Regional Medical Center complaining of a persistent cough since January 2009 (AR 198-200). It was determined that Plaintiff had lung cancer (AR 169-176; 183; 198-200). Plaintiff denied suffering from any neck, back or joint pain, and denied any difficulty walking (AR 201). When seen by Eyad Al-Hattab M.D., an oncologist, on May 5, 2009 for evaluation of her lung cancer, Plaintiff denied suffering from any bony aches or pains, and her physical examination was unremarkable except for tenderness of the left chest wall suggestive of a rib fracture (AR 198-199). On May 12, 2009, Dr. Al-Hattab completed an Employability Assessment Form for the Department of Public Welfare and stated that Plaintiff was permanently disabled due to advanced lung cancer (AR 215-216).

On May 21, 2009, Plaintiff was seen by Sai Yendamuri, M.D. at the Roswell Park Cancer Institute for a surgical consultation (AR 223). Plaintiff reported suffering from headaches and complained of joint pain, especially in her knees (AR 223). Physical examination of her lower extremities revealed no edema and she was neurologically intact (AR 224).

On June 8, 2009, Dr. Yendamuri performed surgery for Plaintiff's lung cancer (AR 231-234). Upon discharge from the hospital, Dr. Yendamuri restricted Plaintiff from lifting any

weight greater than 20 pounds, and she was to avoid strenuous activity (AR 230). At her post-operative check up on June 25, 2009, Plaintiff reported that she felt better and that her energy level continued to improve (AR 226). She noted some shortness of breath, chills, a cough and occasional hoarseness since surgery (AR 226). She further reported suffering from an occasional headache and denied any numbness or tingling in her hands or feet (AR 227). On physical examination, Dr. Yendamuri noted that Plaintiff was alert, oriented, "very pleasant," cooperative and in no apparent distress (AR 227). Her lungs were clear and her surgical scar well healed, and her remaining physical examination was unremarkable (AR 227). Dr. Yendamuri reported that Plaintiff continued to do well and intended to undergo chemotherapy (AR 227).

On June 24, 2009, Plaintiff was psychiatrically evaluated by Kimberly Ann Ditz, C.R.N.P. at The Guidance Center upon referral by the Visiting Nurses Association (AR 336-339). Plaintiff reported no past mental health treatment or medication (AR 336). She indicated that she had experienced depressive symptoms since she was a teenager, including a sad mood and tearfulness, and had tried to commit suicide on four or five occasions (AR 336). Plaintiff claimed an increase in her depressive symptoms over the years, including decreased interest and energy, as well as poor concentration (AR 336). Plaintiff relayed her past physical history, noting that she was healing from cancer surgery without complications and was preparing to undergo chemotherapy (AR 336-337).

Plaintiff complained of trouble falling asleep, anhedonia, decreased energy, poor concentration, suicidal ideations, and racing thoughts with increased irritability and anxiety (AR 337). She reported feelings of hopelessness and worthlessness, and stated that she suffered panic attacks twice a week (AR 337). Plaintiff claimed she stayed secluded in her home (AR 336). She denied any obsessive compulsive disorder symptoms, and reported no cognitive deficits or learning difficulties (AR 338).

On mental status examination, Ms. Ditz reported that Plaintiff was pleasant, cooperative, responsive and maintained good eye contact (AR 338). She was fully oriented, and her speech was clear, productive, non-pressured and spontaneous, and her thoughts were clear (AR 338). Plaintiff reported her mood as "sad" and she was tearful, but she denied suffering from any

suicidal thoughts (AR 338). Ms. Ditz found Plaintiff had no difficulty focusing or concentrating, and her memory and cognition were intact (AR 338). She further found Plaintiff had average intelligence, and her judgment was fair and reliable (AR 338). Ms. Ditz started her on Prozac and Trazodone, and recommended she begin outpatient therapy (AR 338). She diagnosed Plaintiff with depressive disorder, not otherwise specified; panic attacks with agoraphobia; rule out dysthymic disorder; and rule out generalized anxiety disorder (AR 338). Plaintiff was assigned a global assessment of functioning[2] ("GAF") score of 60 (AR 338).

Plaintiff returned to Dr. Al-Hattab on June 26, 2009 and reported that she had been "very active," cleaning and scrubbing the sides of her house (AR 235). Although she stated she became more exhausted, she was fully ambulatory, independent in her daily activities and was eating well (AR 235). She denied any changes in her energy level, had reportedly quit smoking, and took only Motrin for post-operative pain (AR 235). On physical examination, Dr. Al-Hattab noted that Plaintiff appeared healthy and well-nourished, was in no acute distress, and was pleasant and cooperative (AR 236). Her physical examination was unremarkable, and Dr. Al-Hattab recommended Plaintiff undergo chemotherapy and she agreed to begin treatment (AR 236).

When seen by Ms. Ditz on July 9, 2009, Plaintiff reported that she had not started taking the Prozac because she was deciding whether to undergo chemotherapy (AR 334). Plaintiff

---

[2] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 51 to 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41 to 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 31 to 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 21 to 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; and of 11 to 20 may have "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

stated that she would start psychotherapy upon completion of the Visiting Nurses services (AR 334). On mental status examination, Ms. Ditz reported that Plaintiff was alert, fully oriented, pleasant, cooperative, and maintained good eye contact (AR 334). Plaintiff reported her mood as depressed, but she denied any suicidal thoughts and there was no evidence of psychosis (AR 334). Ms. Ditz found Plaintiff's insight into her mental health was "fair" and her judgment was "fair and reliable" (AR 334). Her diagnosis remained the same, and Ms. Ditz assigned her a GAF score of 60 (AR 335).

Plaintiff was seen by Dr. Al-Hattab on September 21, 2009 and he reported that Plaintiff had recovered completely from her surgery (AR 283). Plaintiff informed Dr. Al-Hattab that her husband had recently died within a short period of time after being diagnosed with an advanced thoracic malignancy, and she was depressed and anxious despite taking Xanax (AR 283). Her physical examination was unremarkable (AR 283). Dr. Al-Hattab noted that while the Plaintiff appeared depressed and tearful, he found her to be both "pleasant and cooperative" (AR 283). Dr. Al-Hattab provided Plaintiff with "extensive time in counseling and emotional support" (AR 284). A CT scan of Plaintiff's chest revealed "overall significant improvement" and the mass in the right upper lobe was no longer seen (AR 301). Plaintiff was to return in three months (AR 284).

On September 23, 2009, Edmund P. Papielarski, M.D., a state agency reviewing physician, reviewed the medical evidence of record and concluded that Plaintiff could perform heavy work (AR 285-290).[3] Dr. Papielarski noted that Plaintiff had completely recovered from surgery, refused chemotherapy, had no new complaints, and denied any changes in her appetite, weight or energy level (AR 290). Dr. Papielarski gave consideration to Dr. Al-Hattab's opinion dated May 12, 2009 that Plaintiff was disabled, but noted that disability was an issue reserved to the Commissioner (AR 290).

On October 19, 2009, Plaintiff presented as "very anxious" at her therapy intake evaluation with Wendi Bator, L.C.S.W. (AR 333). Plaintiff reported that her husband had

---

[3] Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. 20 C.F.R. § 404.1567(d).

recently died and she was angry, depressed and "very overwhelmed" (AR 331). Plaintiff further reported that she had no energy or motivation, but denied suffering from any suicidal thoughts (AR 332). Plaintiff stated that she had not taken the medications prescribed by Ms. Ditz (AR 331). On mental status examination, Ms. Bator found Plaintiff's mood and affect were "very depressed," and she was extremely tearful during the interview (AR 332). Her thought processes were logical and no hallucinations or delusions were reported (AR 332). Ms. Bator found Plaintiff was fully oriented, her memory was intact, she was of average intelligence, her judgment and attention span were adequate, and her insight was "fair" (AR 332). She diagnosed Plaintiff with adjustment disorder with depressed mood and bereavement, and assigned her a GAF score of 50 (AR 332). Ms. Bator recommended Plaintiff undergo weekly counseling for her symptoms of depression and grief, and prescribed Klonopin, Trazodone and Prozac (AR 332-333).

On October 22, 2009, Plaintiff was seen by Susan Panah, D.O., and had "no main complaints," stating she was there for the purpose of "establish[ing] with a new physician" (AR 306-307). Plaintiff relayed her lung cancer history, reported that she had refused chemotherapy and continued to smoke (AR 306). Plaintiff further reported a history of depression and anxiety that had worsened following the death of her husband (AR 306). Plaintiff also indicated she had a history of herniated discs in her lower back (AR 306). Her medications consisted of Trazodone, Clonazepam and Fluoxetine (AR 306). Plaintiff complained of weight loss, fatigue, weakness, some cough, shortness of breath, headaches and occasional dizziness (AR 306). Dr. Panah noted that Plaintiff was generally pleasant and in no acute distress, and her physical examination was unremarkable (AR 306). Dr. Panah assessed Plaintiff with lung cancer and depression, and ordered blood work (AR 307).

Plaintiff returned to Ms. Ditz on October 28, 2009 and reported that Klonopin had helped her anxiety but caused fatigue (AR 328). Plaintiff further reported that she had started taking Prozac as prescribed (AR 328). She indicated she was looking for employment but claimed she would have difficulties due to chronic back pain (AR 328). On mental status examination, Ms. Ditz found Plaintiff was cooperative, pleasant and maintained good eye contact (AR 328). She

6

was fully oriented, her speech and thoughts were clear, and her judgment was fair and reliable (AR 328). Plaintiff reported her mood as "sad" and she was tearful, but she denied having any suicidal thoughts (AR 328). Ms. Ditz diagnosed her with bereavement; panic attacks with agoraphobia; depressive disorder not otherwise specified; rule out dysthymic disorder; and rule out generalized anxiety disorder (AR 328). She was assessed with a GAF score of 55, her medications were continued, and she was to continue outpatient psychotherapy with Ms. Bator (AR 329).

At her therapy sessions with Ms. Bator in November 2009, Plaintiff's mood and affect were reported as depressed and she was tearful (AR 326-327). Plaintiff reported that she missed her husband and discussed her grief issues and feelings of anger (AR 326-327). Ms. Bator reported that Plaintiff had "fair participation" but was still "very depressed" (AR 326-327).

Plaintiff returned to Ms. Ditz for a medication check on November 25, 2009 and denied suffering from any acute medical problems (AR 324). She was taking her medications as prescribed and noted an improvement in her sleep but not her mood (AR 324). Ms. Ditz reported that Plaintiff was going through a period of "great grief" and bereavement (AR 324). She noted that Plaintiff continued to express concerns and guilt over the care her husband received in the hospital prior to his death, which caused her to suffer from periods of depression and anger throughout the day (AR 324). On mental status examination, Ms. Ditz reported that Plaintiff was pleasant and cooperative, she maintained good eye contact, was fully oriented, her speech and thoughts were clear, and her judgment was adequate (AR 324). Plaintiff described her mood as "sad" and she was tearful, but she denied having any suicidal thoughts (AR 324). Ms. Ditz noted that Plaintiff sat calmly in a chair and did not fidget (AR 324). Plaintiff denied any side effects from her medication (AR 324). Ms. Ditz's diagnosis remained unchanged, and she assessed Plaintiff with a GAF score of 55 (AR 324). She increased her Prozac dosage, and Plaintiff was to continue psychotherapy (AR 324).

At her December 2009 counseling sessions with Ms. Bator, Plaintiff remained "very depressed" and tearful, and she was encouraged to attend a grief support group (AR 320; 322).

7

On December 22, 2009, Plaintiff returned to Ms. Ditz and reported that she had difficulties with arthritis in her back, knees and hands due to the cold weather (AR 3221). She reported sleeping well most nights, and denied suffering from any medication side effects (AR 321). She stated that she was motivated to work around her house and kept busy cleaning out closets (AR 321). She also stated that her 13 year old grandson stayed with her off and on and he was a "good diversion" (AR 321). Plaintiff further reported that she "enjoyed" her time alone however, because she was often tearful (AR 321). Plaintiff indicated that her daughter checked on her daily and they planned to attend a bereavement group (AR 321).

On mental status examination, Ms. Ditz reported that Plaintiff was pleasant, cooperative, alert, fully oriented and maintained good eye contact (AR 321). Her speech was clear and productive, and her thoughts were clear and non-racing (AR 321). Plaintiff reported her mood as "sad" and "depressed" and she was tearful, but she denied having any suicidal thoughts (AR 321). Ms. Ditz reported that Plaintiff exhibited "more appropriate social smiling" than she had in the past (AR 321). She found Plaintiff's memory and cognition were intact, her insight was fair, and her judgment was fair and reliable (AR 321). Ms. Ditz diagnosed Plaintiff with bereavement; panic attacks with agoraphobia; depressive disorder not otherwise specified; rule out dysthymic disorder; and rule out generalized anxiety disorder, and assigned her a GAF score of 55 (AR 321).

At her January 2010 counseling sessions, Ms. Bator reported that Plaintiff's mood and affect remained depressed (AR 318-319). Plaintiff remained angry and blamed the nurses at the hospital for her husband's death (AR 318). Plaintiff was encouraged to attend a different grief support group (AR 318). Ms. Bator reported that Plaintiff was not making progress in counseling (AR 318-319).

Plaintiff returned to Dr. Al-Hattad on January 4, 2010 and had no physical complaints (AR 309). Dr. Al-Hattad reported however, that Plaintiff remained "extremely depressed" with respect to her husband's illness and death and was reaching a state of "catatonic depression," but she denied suffering from any homicidal or suicidal ideations (AR 309). Dr. Al-Hattad found Plaintiff to be healthy appearing, pleasant and cooperative, but also "deeply depressed" and

tearful (AR 309). Dr. Al-Hattad reported that Plaintiff had fully recovered from surgery, and that a chest CT scan dated December 28, 2009 showed some slight reactive change but was otherwise unremarkable (AR 310-311). He provided counseling and emotional support, and encouraged Plaintiff to follow up with psychiatric services (AR 310).

Plaintiff returned to Ms. Ditz on February 2, 2010 and reported that her CT scan was negative and she was "disappointed" that her lung cancer had not returned (AR 316). Plaintiff continued to have feelings of hopelessness and helplessness in dealing with the death of her husband (AR 316). On mental status examination, Ms. Ditz reported that Plaintiff was pleasant, cooperative, responsive, fully oriented and maintained good eye contact (AR 316). Her speech was low and slow in tone and her thoughts were clear (AR 316). Plaintiff was sad and tearful, but denied having any suicidal thoughts (AR 316). Insight into her mental health was reported as "fair" and her judgment was considered fair and reliable (AR 316). Plaintiff's diagnosis and GAF score remained unchanged, and Ms. Ditz continued her medication regimen (AR 316-317).

Plaintiff returned to Ms. Bator on February 8, 2010 who found that Plaintiff's affect and mood were depressed and she was tearful (AR 315). Ms. Bator reported that although Plaintiff denied being suicidal, she had no interest in living (AR 315). She further reported that Plaintiff was not making progress in therapy (AR 315).

Finally, on February 23, 2010, Ms. Bator reported that Plaintiff's affect and mood were "very depressed" and she was tearful (AR 314). Plaintiff reported that she lost her home and was moving in with her daughter (AR 314). Plaintiff further reported that she was confronted by her children after she had informed her brother she wanted to die after she had been drinking (AR 314). Ms. Bator assessed her safety and set up a plan (AR 314). Ms. Bator reported that Plaintiff was resistant in moving forward with her life, her mood was deteriorating, she appeared to be regressing, and she lacked motivation (AR 314). Ms. Bator notified Ms. Ditz of her concerns (AR 314).

Plaintiff and Laura Morgan, the Plaintiff's daughter, testified at the hearing held by the ALJ on March 31, 2010 (AR 22-56). Plaintiff testified that she lived with her daughter and her family (AR 26). She indicated that she had trouble breathing, and experienced knee and back

pain (AR 28-29). Plaintiff stated that her chest ached daily even with inactivity (AR 28). Plaintiff further claimed that she suffered from constant back pain due to a herniated disc (AR 34-35). She indicated that she suffered from knee pain a few times per week, as well as leg and arm weakness (AR 34; 37). Plaintiff claimed that her leg would occasionally give out on her causing her to fall (AR 37). Plaintiff testified that she could only stand for up to 15 minutes, walk a couple of blocks, and sit for 30 minutes to one hour (AR 43). She was able to do her own laundry and make her bed, but did not perform any other chores (AR 41). Plaintiff testified that she had no hobbies, did not attend church or visit with friends, and only left the house to attend doctors' appointments (AR 40-41). Plaintiff stated that she was easily fatigued and had to lie down two to three times per day (AR 34; 40). She claimed she had not sought treatment for her physical complaints because she was unable to find a doctor due to a lack of insurance (AR 35).

Plaintiff testified that she had always suffered from depression, but that her symptoms had worsened following the death of her husband (AR 30; 34). She further testified that she suffered from anxiety and daily panic attacks that began approximately four or five years prior to the hearing (AR 30-31). She claimed that an attack lasted eight minutes and that it took a while to "calm down" thereafter (AR 32-33). Plaintiff stated that most of the time she stayed in her room alone and avoided other people (AR 31; 45). She claimed she had difficulty completing tasks and concentrating (AR 32). Plaintiff indicated that she was not properly caring for herself when she lived alone and that her daughter asked her to move in with her family (AR 46). Plaintiff stated that she frequently thought about suicide and was not aggressively fighting her cancer (AR 46-47).

Ms. Morgan testified that Plaintiff had moved into her home approximately two months prior to the hearing after having been given the choice of being admitted for mental health treatment or moving in with her family (AR 52-53). She stated that when Plaintiff lived alone, she did not eat, did not clean her house, and left dirty dishes in the sink for a week (AR 48; 54). She indicated that Plaintiff had always suffered from depression, but that her symptoms had worsened following her father's death (AR 54). She stated that Plaintiff did not care about her appearance, suffered from crying spells four times per week, and stayed in her room alone (AR

48; 52; 54). Ms. Morgan testified that every time she saw Plaintiff in her room she was laying on her bed and spent her days dressed in her pajamas (AR 51; 55). She indicated that Plaintiff became short of breath climbing the stairs while carrying 10 to 15 pounds, and also suffered from back and neck pain, as well as headaches (AR 50-51).

Following the hearing, the ALJ issued a written decision concluding that Plaintiff was not entitled to a period of disability or DIB within the meaning of the Act (AR 10-17). Her request for an appeal with the Appeals Council was denied rendering the ALJ's decision the final decision of the Commissioner (AR 1-3). She subsequently filed this action.

### III. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 1097, 229 (1938)); *see also Richardson v. Parales*, 402 U.S. 389, 401 (1971); *Ventura v. Shalala*, 55 F.3d 900, 901 (3rd Cir. 1995). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson*, 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3rd Cir. 1995). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3rd Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

11

## IV.    DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). In order to be entitled to DIB under Title II, a claimant must additionally establish that her disability existed before the expiration of her insured status. 42 U.S.C. § 423(a), (c); *Matullo v. Bowen*, 926 F.2d 240, 244 (3rd Cir. 1990) (claimant is required to establish disability prior to expiration of insured status); *see also* 20 C.F.R. § 404.131. The ALJ found that Plaintiff met the disability insured status requirements of the Act through December 31, 2011 (AR 12). Therefore, Plaintiff must show that she was disabled on or prior to that date for purposes of entitlement to disability insurance.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen*, 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. Id. If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since May 2, 2009 (AR 12). The ALJ further found that her depression, anxiety

and panic attacks were severe impairments, but determined at step three that she did not meet a listing (AR 12-14). The ALJ found that Plaintiff had the residual functional capacity to occasionally lift and carry 50 pounds, frequently lift and carry 25 pounds, stand/walk for 6 hours in an 8 hour workday, and sit for 2 hours in an 8 hour work day, and could only work in a job with a moderate amount of stress (AR 154).[4] He concluded that she was capable of performing her past relevant work as a machine operator or housekeeper, since this work did not require the performance of work-related activities precluded by her residual functional capacity (AR 17). Again, I must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff argues that the ALJ erred in failing to identify the medical evidence upon which he based his decision and in failing to assign weight to any of the medical evidence of record. *See* [ECF No. 8] Plaintiff's Brief p. 11. Specifically, Plaintiff contends that the ALJ erred in rejecting the medical evidence from The Guidance Center without identifying any contrary medical evidence. *See* [ECF No. 8] Plaintiff's Brief pp. 11-12. As set forth previously, The Guidance Center records contain treatment note entries by Ms. Ditz, a certified registered nurse practitioner, and Ms. Bator, a licensed clinical social worker, for the period June 24, 2009 through February 23, 2010 (AR 313-339). An ALJ is to consider opinions relative to a claimant's disability from individuals who are not deemed "acceptable medical sources," such as Ms. Ditz and Ms. Bator. *See* 20 C.F.R. 404.1513(d)(1) (defining "other sources" as, *inter alia*, nurse practioners and therapists). However, the opinions of individuals who are not acceptable medical sources are not entitled to controlling weight. *Hartranft v. Apfel*, 181 F.3d 358, 361 (3rd Cir. 1999); *Yensick v. Barnhart*, 245 Fed. Appx. 176, 181 (3rd Cir. 2007). Therefore, to the extent Plaintiff argues that Ms. Ditz's and/or Ms. Bator's findings were entitled to controlling weight, such contention is without merit.

Although the findings of Ms. Ditz and Ms. Bator are not entitled to controlling weight, these individuals are "valuable sources of evidence for assessing impairment severity and

---

[4] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R § 404.1567(c).

13

functioning." Social Security Ruling "("*SSR*") 06-03p; 2006 WL 2329939 at *3. When evaluating evidence from other sources, the ALJ is directed to use the same factors as are used to evaluate evidence from acceptable medical sources. *SSR* 06-03p; 2003 WL 2329939 at *4 (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)). These factors include, but are not limited to, the nature and extent of the relationship between the source and the individual; the source's qualifications; the source's area of specialty or expertise; the degree to which the source presents relevant evidence to support his or her opinion; whether the opinion is consistent with other evidence; and any other factors that tend to support or refute the opinion. *SSR* 06-03p; 2006 WL 2329939 at *5.

      I find that the ALJ evaluated this evidence consistent with the above standards. The ALJ implicitly accepted the diagnoses of depression, anxiety and panic attacks rendered by Ms. Ditz and/or Ms. Bator, since he specifically found that Plaintiff suffered from these severe impairments (AR 154). In determining the extent of the Plaintiff's functional limitations resulting from these impairments, the ALJ reviewed the findings contained in The Guidance Center treatment notes (AR 16-17). The ALJ observed that the Plaintiff's mental status examinations were always reportedly the same (sad and tearful), and that her GAF scores were almost always reported as a 55, which denoted only moderate psychological symptoms (AR 16). The ALJ further observed that Plaintiff had never been treated by a psychiatrist, and that no treating source supported the Plaintiff's alleged inability to work due to her mental impairments (AR 16-17). He gave limited weight to the opinion that Plaintiff suffered from agoraphobia, given the fact that Plaintiff reported she was actively looking for employment (AR 17). The ALJ's findings in this regard are supported by substantial evidence.

      Plaintiff also argues that the ALJ failed to fully develop the record with respect to her mental impairments. *See* [ECF No. 8] Plaintiff's Brief pp. 11-12. The ALJ has a duty to develop a "full and fair" record in social security cases, *see Ventura v. Shalala*, 55 F.3d 900, 902 (3rd Cir. 1995), which may include ordering a consultative examination. *See* 20 C.F.R. § 404.1519. The decision whether to seek further examinations and consultations regarding a claimant's impairments is discretionary however, and only necessary where the claimant has shown that the

record as developed is not sufficient for the ALJ to make a determination. *Thompson v. Halter*, 45 Fed. Appx. 146, 149 (3rd Cir. 2002) (citing 20 C.F.R. §§ 404.1517, 416.917); *Schwartz v. Halter*, 134 F. Supp. 2d 640, 657-58 (E.D.Pa. 2001). Other circumstances necessitating a consultative examination include situations where a claimant's medical records do not contain needed additional evidence, or when the ALJ needs to resolve a conflict, inconsistency or ambiguity in the record. *See* 20 C.F.R. § 404.1519a(b).

I find no error in the ALJ's failure to have ordered a consultative examination with respect to the Plaintiff's mental impairments. The ALJ fully analyzed and discussed the Plaintiff's medical history, clinical findings, and statement of diagnosis for her claimed mental impairments (AR 16-17). The ALJ also reviewed and discussed the Plaintiff's written statements to the agency, her testimony from the hearing, and her daughter's testimony from the hearing (AR 13-17). The ALJ noted that the Plaintiff was able to wash dishes, do the laundry, make her bed, vacuum, drive to and from doctor's appointments, was independent with personal care, and cared for her husband prior to his death (AR 13; 15). He further noted that although the Plaintiff claimed to have difficulties with concentration, none of her mental status examinations since June 2009 revealed any problems with concentration (AR 13-14). The ALJ recognized that Plaintiff claimed to have suffered from depression since she was a teenager, yet she was able to work thereafter (AR 17). The ALJ noted that the Plaintiff reported in October 2009 that she was looking for work, and further reported in December 2009 she was motivated to work around her home (AR 16). The ALJ assigned little weight to her daughter's testimony that Plaintiff suffered significant deficits in her mental functioning, in light of the fact that Plaintiff testified she was seeking employment (AR 16). In sum, substantial evidence supported the ALJ's conclusion that the Plaintiff's mental impairments did not preclude her from working.

Plaintiff further challenges the ALJ's RFC assessment with respect to her physical impairments, arguing that because she testified to constant back pain, knee pain and trouble breathing, the ALJ should have obtained a current physical assessment that evaluated her entire physical condition. *See* [ECF No. 8] Plaintiff's Brief pp. 12-15. Again, I find no error in the ALJ's failure to have ordered a consultative examination relative to the Plaintiff's physical

impairments. Plaintiff claimed disability on the basis of her lung cancer (AR 101-107; 132). However, as the ALJ found, Plaintiff's medical records reveal that Dr. Al-Hattab reported that Plaintiff had "completely recovered" by September 2009 (AR 13; 283). On January 4, 2010, Plaintiff reported no physical complaints related to this impairment (AR 13; 309-311), and Dr. Al-Hattab again reported that Plaintiff had fully recovered from surgery (AR 310-311). Dr. Al-Hattab noted that a CT scan dated December 28, 2009 showed some slight reactive change, but was otherwise unremarkable (AR 310-311).

With respect to her complaints of musculoskeletal pain, the ALJ concluded that Plaintiff's pain symptoms were not as severe as alleged (AR 17). The ALJ found it significant that Plaintiff was not treating with any doctor for her complaints of pain, and only took Ibuprofen for pain relief (AR 15). The ALJ also considered the Plaintiff's activities in evaluating her complaints of pain, noting that she was independent with her personal care, and was able to do the dishes once a week, do laundry, make her bed, vacuum, and drive to and from doctor's appointments (AR 15). Although the Plaintiff claims that she did not seek treatment for her pain due to a lack of insurance, the record reflects that she sought and received treatment from various health care providers after her diagnosis of a small disc herniation in April 2005. As the Commissioner points out, there was nothing to prevent her from raising her complaints to these health care providers. In sum, I find no error in the ALJ's evaluation of the medical evidence with respect to the Plaintiff's physical impairments.

Finally, Plaintiff contends that the ALJ erred in failing to obtain the testimony of a vocational expert in order to determine whether she was capable of performing her past relevant work since she suffered from "significant" non-exertional limitations, including depression and anxiety. *See* [ECF No. 8] Plaintiff's Brief pp. 13-14. However, there is no requirement that the ALJ seek the testimony of a vocational expert at step four. *Lopez v. Comm'r of Soc. Sec.*, 270 Fed. Appx. 119, 123 (3rd Cir. 2008) ("At step four of the sequential evaluation process, the decision to use a vocational expert is at the discretion of the ALJ."); *Mays v. Barnhart*, 78 Fed. Appx. 808, 813-14 (3rd Cir. 2002) (same). At step four, the claimant is not considered disabled if she can perform her past relevant work, *see* 20 C.F.R. § 404.1520(a)(4)(iv), and the claimant

bears the burden of demonstrating an inability to return to her past relevant work. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3rd Cir. 2000).

Here, Plaintiff has failed to demonstrate an inability to perform her past relevant work as a machine operator or housekeeper on the basis of her mental impairments. Plaintiff contends that the treatment notes from The Guidance Center establish that her depression and anxiety "drastically impact" her ability to function on a daily basis. *See* [ECF No. 8] Plaintiff's Brief p. 14. However, as the ALJ observed in his evaluation of this evidence, Plaintiff's health care providers never imposed any functional restrictions due to her mental impairments and consistently assessed her with only moderate symptoms. Although Plaintiff's mental status examinations noted that she was depressed, she was also consistently pleasant, cooperative, and fully oriented, and no difficulties with concentration, memory or cognition were noted (AR 328; 334; 328). Plaintiff was also reportedly actively seeking employment in October 2009 (AR 28). Accordingly, I find that the ALJ's conclusion that Plaintiff was not disabled is supported by substantial evidence.

## V.     CONCLUSION

For the reasons discussed above, the Plaintiff's motion for summary judgment will be denied and the Defendant's motion for summary judgment will be granted. An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THERESA FRANCES VEITE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 11-28 Erie |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **ORDER**

AND NOW, this 27th day of December, 2011, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [ECF. No. 7] is DENIED and the Defendant's Motion for Summary Judgment [ECF No. 9] is GRANTED. JUDGMENT is hereby entered in favor of Michael J. Astrue, Commissioner of Social Security, and against Plaintiff, Theresa Frances Veite.

The clerk is directed to mark the case closed.

                                                                 s/ Sean J. McLaughlin
                                                                   United States District Judge

cm:    All parties of record